1
2
3
4
5
6
7
8                         UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ARTHUR BERNETT POWERS,                    Case No.  1:22-cv-01131-CDB

12                 Plaintiff,                   ORDER DENYING PLAINTIFF'S MOTION
                                                FOR SUMMARY JUDGMENT, AND
13         v.                                   GRANTING DEFENDANT'S CROSS-
                                                MOTION FOR SUMMARY JUDGMENT
14   COMMISSIONER OF SOCIAL
     SECURITY,                                  (Docs. 15, 17)
15
                   Defendant.
16

17

18         Plaintiff Arthur Bernett Powers ("Plaintiff") seeks judicial review of a final decision of the

19   Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for

20   Social Security benefits pursuant to Title II of the Social Security Act.  (Doc. 1.)  The matter is

21   before the Court on the certified administrative record (Doc. 12) and the parties' briefs, which

22   were submitted without oral argument.  (Docs. 15, 17.)[1]

23         Plaintiff asserts the Administrative Law Judge ("ALJ") failed to properly make a mental

24   residual functional capacity assessment and failed to sufficiently develop the record.  (Doc. 15 at

25   17-23.)  Plaintiff separately asserts the Appeals Council improperly declined to consider evidence

26   submitted by Plaintiff.  *Id*. at 14-17.  Plaintiff requests the decision of the Commissioner be

27   _____

28         [1]  Both parties have consented to the jurisdiction of a magistrate judge for all proceedings
     in this action, in accordance with 28 U.S.C. § 636(c)(1).  (Doc. 11.)

1    vacated and the case be remanded for further proceedings and proper evaluation of the evidence.

2    *Id*. at 23.

3                     **I.     BACKGROUND**

4        **A. Administrative Proceedings**

5         Plaintiff filed the instant application for Social Security benefits under Title II on February

6    12, 2019, alleging disability beginning February 5, 2019. (*See* Admin. Rec. ("AR") 458–59,

7    Docs. 12-1, 12-2.) Plaintiff alleges he was unable to work due to major depression. (AR 478.)

8    Plaintiff's claim was initially denied on April 24, 2019, and denied upon reconsideration on

9    August 20, 2019. (AR 383–96, 414–19.) On October 14, 2020, Plaintiff appeared via telephonic

10   conference, for an administrative hearing before Administrative Law Judge Scott A. Bryant (the

11   "ALJ"). (AR 351–82.) Although informed of his right to representation, Plaintiff chose to appear

12   and testify without the assistance of an attorney or other representative. Vocational expert ("VE")

13   Deborah Christensen and Plaintiff's wife, Tachua Vue, also testified at the hearing. On August 4,

14   2021, the ALJ issued a decision denying benefits. (AR 68–90.) On June 30, 2022, the Appeals

15   Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the

16   Commissioner. (AR 1–7.)

17         Plaintiff initiated this action in federal court on September 2, 2022, and seeks judicial

18   review of the denial of his application for benefits. (Doc. 1.) The Commissioner lodged the

19   administrative record on December 6, 2022. (Doc. 12.) On March 20, 2023, Plaintiff filed a

20   motion for summary judgment. (Doc. 15.) On May 4, 2023, Defendant filed a cross-motion for

21   summary judgment and brief in opposition to Plaintiff's motion. (Doc. 17.) No reply brief was

22   filed and the matter is deemed submitted on the pleadings.

23        **B. Medical Record**

24         The relevant medical record was reviewed by the Court and will be referenced below as

25   necessary to this Court's decision.

26        **C. The ALJ's Decision**

27         The ALJ conducted the five-step disability analysis and made the following findings of

28   fact and conclusions of law as of the date of the decision, August 4, 2021 (AR 74–87.)

At step one, the ALJ determined Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2023, and Plaintiff has not engaged in substantial gainful activity since February 5, 2019, the alleged onset date.  (AR 74 (citing 20 C.F.R. §§ 404.1571 *et seq*.).)

At step two, the ALJ determined Plaintiff has the following severe impairments: major depressive disorder ("MDD"), borderline intellectual functioning; and obesity.  (*Id.* (citing 20 C.F.R. § 404.1520(c)).)

At step three, the ALJ determined Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (AR 74–75 (citing 20 C.F.R. §§ 404.1520(d); 404.1525; 404.1526).)  In reaching this determination, the ALJ considered the mental impairment listings 12.04 (depressive, bipolar and related disorders) and 12.11 (neurodevelopmental disorders).  The ALJ also considered the paragraph B criteria and found that Plaintiff's mental impairments do not result in one extreme limitation or two marked limitations in a broad area of functioning.[2]  (AR 75–76.)  More specifically, the ALJ determined Plaintiff has "moderate" limitations in all four functional areas.  (AR 75.)  The ALJ also considered the "paragraph C" criteria, and determined this also was not satisfied.[3]  (AR 76.)

Before proceeding to step four, the ALJ determined Plaintiff has the RFC to perform a full range of work at all exertional levels, but with the following non-exertional limitations:

**he can only perform simple and routine tasks in the workplace (i.e. he is not**

---

[2] The "paragraph B criteria" evaluates mental impairments in the context of four broad areas of functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself.  20 C.F.R. § Pt. 404, Subpt. P, App. 1.  The severity of the limitation a claimant has in each of the four areas of functioning is identified as either "no limitation," "mild," "moderate," "marked," or "extreme."  *Id.* To satisfy the paragraph B criteria, a claimant must have an "extreme" limitation in at least one of the areas of mental functioning, or a "marked" limitation in at least two of the areas of mental functioning.  *Id.*

[3] To satisfy the "paragraph C" criteria, there must be a medically documented history of the existence of the mental disorder in the listing category over a period of at least two years and there must be evidence of both: (1) medical treatment, mental health therapy, psychosocial support (s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of the mental disorder; and (2) marginal adjustment, that is, minimal capacity to adapt to changes in the environment or to demands that are not already part of daily life.  20 C.F.R. § Pt. 404, Subpt. P, App. 1.

1  **capable of complex judgment or analysis).  The claimant can only
2  occasionally interact with supervisors, coworkers, and the public.  He can
   only frequently engage in preproduction pace work.  The claimant can only
3  frequently adapt to changes in the workplace.**

4  (AR 76–83, 85–86 (citing 20 C.F.R. §§ 404.1529; 404.1520c; SSR 16-3p, *available at* 2017 WL

5  5180304 (Oct. 25, 2017)) (emphasis in original).)

6       At step four, the ALJ found Plaintiff is unable to perform any past relevant work.  (AR 83

7  (citing 20 C.F.R. § 404.1565).)

8       At step five, the ALJ noted Plaintiff was born on November 4, 1981, and was 37 years old

9  (which is defined as a younger individual aged eighteen to forty-nine) on the alleged disability

10 onset date; Plaintiff has at least a high school education; and transferability of job skills is not

11 material to the determination of disability because using the Medical-Vocational Rules as a

12 framework supports a finding that Plaintiff is "not disabled," whether or not Plaintiff has

13 transferrable job skills.  (AR 84 (citing 20 C.F.R. §§ 404.1563; 404.1564; SSR 82-41, *available*

14 *at* 1982 WL 31389 (Jan. 1, 1982); 20 C.F.R. Part 404, Subpart P, Appendix 2).)  Considering

15 Plaintiff's age, education, work experience, and RFC, the ALJ determined there are jobs that exist

16 in significant numbers in the national economy that Plaintiff can perform, such as:

17  - Cleaner (Dictionary of Occupational Titles ("DOT") 323.687-014), a light-exertional

18    work position with a specific vocational preparation ("SVP") level of 2, and

19    approximately 221,000 jobs available in the national economy;

20  - Dishwasher (DOT 318.687-010), a medium-exertional work position, SVP 2, and

21    approximately 148,000 jobs available in the national economy; and

22  - Floor Waxer (DOT 381.687-034), a medium-exertional work position, SVP 2, and

23    approximately 118,000 jobs available in the national economy.

24 (AR 84–85 (citing 20 C.F.R. §§ 404.1569; 404.1569(a); 20 C.F.R. Part 404, Subpart P, Appendix

25 2; SSR 83-11, *available at* 1983 WL 31252 (Jan. 1, 1983); SSR 83-12, *available at* 1983 WL

26 31253 (Jan. 1, 1983); SSR 83-14, *available at* 1983 WL 31254 (Jan. 1, 1983); SSR 85-15,

27 *available at* 1985 WL 56857 (Jan. 1, 1985)).)  With respect to the identified jobs, the ALJ noted

28 the VE's testimony was consistent with the DOT.  (AR 84 (citing SSR 00-4p, *available at* 2000

4

1   WL 1898704 (Dec. 4, 2000)).)

2        Therefore, the ALJ found Plaintiff has not been under a disability, as defined in the Social

3   Security Act, from February 5, 29019 (the alleged date of onset) through August 4, 2021 (the date

4   of decision).  (AR 86–87 (citing 20 C.F.R. § 404.1520(g)).).

5        **D. The Appeals Council Action**

6        In letters dated August 19, 2021 and October 12, 2021, respectively, the Appeals Council

7   granted Plaintiff additional time to submit a statement about the facts and the law or additional

8   evidence, provided the evidence was new, material, and related to the period on or before the date

9   of the hearing decision; that there was a reasonable probability that the additional evidence would

10  change the outcome of the decision; and that Plaintiff could show good cause for failing to submit

11  the evidence earlier.  (AR 8–12, 25–26.)

12       On November 26, 2021, Plaintiff through his counsel, sent additional medical records to

13  the Appeals Council dated September 18, 2019 through November 16, 2021.  (AR 27–350.)

14       On June 30, 2022, the Appeals Council issued a Notice of Action regarding the ALJ's

15  August 4, 2021 decision.  (AR 1–7.)  In its notice, the Appeals Council stated it considered

16  Plaintiff's reasons for disagreeing with the ALJ's decision, determined they did not provide a

17  basis for changing the ALJ's decision, and denied Plaintiff's request for review.  (AR 1.)  More

18  specifically, the Appeals Council explained Plaintiff's additional evidence from Dr. Javier Torres

19  was not exhibited because it is not new, but rather is a copy of Exhibit 4F.  (AR 2) (*Compare* AR

20  345 *with* AR 575.)

21       The Appeals Council declined to exhibit Plaintiff's evidence from House Psychiatric

22  Clinic dated December 6, 2013 through December 16, 2013 (AR 350); Saint Agnes Medical

23  Center dated January 11, 2017 (AR 346–49); and Psychology for Medicaid California dated May

24  18, 2012, September 18, 2019 through January 30, 2020, February 4, 2020 through June 26,

25  2020, June 28, 2021 through February 13, 2021, February 19, 2021 through June 3, 2021, and

26  June 21, 2021 through August 3, 2021 (AR 91–344), because it found this evidence did not show

27  a reasonable probability that it would change the outcome of the decision.  (AR 2.)

28       Finally, the Appeals Council declined to exhibit Plaintiff's evidence from Psychology for

1    Medicaid California dated August 10, 2021 through November 16, 2021 and August 31, 2021

2    (AR 14–16, 27–67); California Medicaid Psychiatry dated August 26, 2021 (AR 17–20); and

3    Piotr Pelc, D.O. dated September 9, 2021 (AR 13), because it did not relate to the period at issue

4    and therefore did not affect whether Plaintiff was disabled beginning on or before August 4, 2021.

5    (AR 2.)  The Appeals Council further explained to Plaintiff that, if he wanted to be considered for

6    a disability after August 4, 2021, he would need to apply again.

7                    **II.    LEGAL STANDARD**

8         **A. The Disability Standard**

9         Disability Insurance Benefits and Supplemental Security Income are available for every

10   eligible individual who is "disabled."  42 U.S.C. §§ 402(d)(1)(B)(ii) and 1381(a).  An individual

11   is "disabled" if unable to "engage in any substantial gainful activity by reason of any medically

12   determinable physical or mental impairment …"[4]  *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987)

13   (quoting identically worded provisions of 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A)).  To

14   achieve uniformity in the decision-making process, the Social Security regulations set out a five-

15   step sequential evaluation process to be used in determining if an individual is disabled.  *See* 20

16   C.F.R. § 404.1520; *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1194 (9th Cir. 2004).

17   Specifically, the ALJ is required to determine:

18
19          (1) whether a claimant engaged in substantial gainful activity during the period of
             alleged disability, (2) whether the claimant had medically determinable "severe"
20          impairments, (3) whether these impairments meet or are medically equivalent to one
             of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4)
21          whether the claimant retained the RFC to perform past relevant work and (5)
             whether the claimant had the ability to perform other jobs existing in significant
22          numbers at the national and regional level.

23   *Stout v. Comm'r. Soc. Sec. Admin.*, 454 F.3d 1050, 1052 (9th Cir. 2006).  The burden of proof is

24   on a claimant at steps one through four.  *Ford v. Saul*, 950 F.3d 1141, 1148 (9th Cir. 2020) (citing

25   *Valentine v. Comm'r of Soc. Sec. Admin*, 574 F.3d 685, 689 (9th Cir. 2009)).

26   _____
27          [4] A "physical or mental impairment" is one resulting from anatomical, physiological, or
     psychological abnormalities that are demonstrated by medically acceptable clinical and laboratory
     diagnostic techniques.  42 U.S.C. § 423(d)(3).
28

Before making the step four determinations, the ALJ first must determine the claimant's RFC.  20 C.F.R. § 416.920(e).  The RFC is the most a claimant can still do despite his limitations and represents an assessment based on all relevant evidence.  20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1)).  The RFC must consider all of the claimant's impairments, including those that are not severe.  20 C.F.R. § 416.920(e); § 416.945(a)(2).  *E.g.*, *Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013) ("These regulations inform us, first, that in assessing the claimant's RFC, the ALJ must consider the combined effect of all of the claimant's medically determinable impairments, whether severe or not severe.").  The RFC is not a medical opinion.  20 C.F.R. § 404.1527(d)(2).  Rather, it is a legal decision that is expressly reserved to the Commissioner.  20 C.F.R. § 404.1546(c); *see Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001) ("[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity.").

At step five, the burden shifts to the Commissioner to prove that Plaintiff can perform other work in the national economy given the claimant's RFC, age, education, and work experience.  *Garrison v. Colvin*, 759 F.3d 995, 1011 (9th Cir. 2014).  To do this, the ALJ can use either the Medical-Vocational Guidelines or rely upon the testimony of a VE.  *Lounsburry v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006); *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001).  "Throughout the five-step evaluation, the ALJ 'is responsible for determining credibility, resolving conflicts in medical testimony and for resolving ambiguities.'"  *Ford*, 950 F.3d at 1149 (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

**B. Standard of Review**

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits.  42 U.S.C. § 405(g).  In determining whether to reverse an ALJ's decision, a court reviews only those issues raised by the party challenging the decision.  *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001).  A court may set aside the Commissioner's denial of benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence.  *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).

"Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (quoting *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir, 1995)). "[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Rather, "[s]ubstantial evidence means more than a scintilla, but less than a preponderance; it is an extremely deferential standard." *Thomas v. CalPortland Co.*, 993 F.3d 1204, 1208 (9th Cir. 2021) (internal quotations and citations omitted).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012) (internal quotations and citations omitted). "If the evidence 'is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.'" *Ford*, 950 F.3d at 1154 (quoting *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005)). Even if the ALJ has erred, the Court may not reverse the ALJ's decision where the error is harmless. *Stout*, 454 F.3d at 1055-56. An error is harmless where it is "inconsequential to the [ALJ's] ultimate nondisability determinations." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (quotation and citation omitted). The burden of showing that an error is not harmless "normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

## III.   LEGAL ISSUES

On appeal, Plaintiff presents three legal issues: (1) whether the Appeals Council erred in failing to incorporate and evaluate Plaintiff's new evidence; (2) whether the ALJ erred in failing to consider Plaintiff's impairment of generalized anxiety disorder ("GAD") to be severe; and (3) whether the ALJ had a duty to further develop the record. (*See* Doc. 15 at 3.)

## IV.   DISCUSSION

### A. Whether the Appeals Council Failed to Consider Plaintiff's New Evidence

The Ninth Circuit has "routinely considered evidence submitted for the first time to the Appeals Council to determine whether, in light of the record as a whole, the ALJ's decision was supported by substantial evidence." *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1163

8

(9th Cir. 2012) ("we hold that when the Appeals Council considers new evidence in deciding whether to review a decision of the ALJ, that evidence becomes part of the administrative record, which the district court must consider when reviewing the Commissioner's final decision for substantial evidence."); *see Lingenfelter v. Astrue*, 504 F.3d 1028, 1030 n.2 (9th Cir. 2007) (noting that when the Appeals Council considers new evidence in denying a claimant's request for review, the reviewing court considers both the ALJ's decision and the additional evidence submitted to the Council).

However, the Ninth Circuit distinguishes evidence the Appeals Council has "considered" from evidence the Appeals Council has merely "looked at" to determine whether the additional evidence was incorporated into the record. Evidence the Appeals Council considered becomes part of the administrative record as "evidence upon which the findings and decision complained of are based." *Brewes*, 682 F.3d at 1162. Where "the Appeals Council *only looked at* the evidence," by contrast, "the new evidence did not become part of the record." *Amor v. Berryhill*, 743 Fed. App'x 145, 146 (9th Cir. 2018) (emphasis added); *see Garcia v. Saul*, No. 1:19-cv-1103-JLT, 2021 WL 223205, at *3 (E.D. Cal. Jan. 22, 2021) (observing Ninth Circuit distinguishes between instances where the Appeals Council "considered" evidence and made it part of the administrative record with instances where the Appeals Council only "looked at" the evidence). Importantly, where the Appeals Council only looks at the evidence and it does not become part of the administrative record, the district court "may not consider it" unless the plaintiff carries the burden to demonstrate the evidence should have been considered by the Appeals Council. *Amor*, 743 Fed. App'x at 146; *Hensley v. Comm'r of Soc. Sec. Admin*, No. 2:20-cv-1448-KJN, 2022 WL 891289, at *13 (E.D. Cal. Mar. 25, 2022) (citing 20 C.F.R. § 404.935(b) (making "good cause" one of the three requirements for Appeals Council consideration of new evidence)).

The Regulations govern when the Appeals Council is obligated to consider additional evidence submitted after the ALJ issues a decision. *See* 20 C.F.R. §§ 404.970. Pursuant to the regulations, the Appeals Council "will review a case if … the Appeals Council receives additional evidence that is new, material, and relates to the period on or before the date of the hearing

decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision." 20 C.F.R. § 404.970(a)(5).  Additionally, the claimant must establish good cause exists for the late submission.  20 C.F.R. §§ 404.970(b).  It is the claimant's burden to establish the evidence should have been considered by the Appeals Council under the Regulations.  *Hawks v. Berryhill*, No. 1:17CV1021, 2018 WL 6728037 at *4 (M.D.N.C. Dec. 21, 2018) (noting under the amended regulations, "a claimant's burden to have new evidence considered for the first time at the Appeals Council level" includes "a requirement to show a reasonable probability of a different outcome").  When the Appeals Council fails to "consider" additional evidence that satisfies the requirements of §§ 404.970(b) or 416.1470(b), a remand for further administrative proceedings is appropriate.  *Taylor v. Comm'r of Soc. Sec. Admin*., 659 F.3d 1228, 1233 (9th Cir. 2011).

**1. Whether the Appeals Council "Considered" or "Reviewed" the Evidence**

Here, the Appeals Council denied Plaintiff's request for review of the ALJ's decision with respect to Plaintiff's new evidence on the basis that some of the evidence was duplicative of evidence already in the record, some evidence was inapplicable to the relevant disability time period, and some evidence did not show a reasonable probability that it would change the outcome of the ALJ's decision.  (AR 2.)  Further, the Appeals Council expressly declined to make the supplemental records a part of the administrative record.

Accordingly, the Court finds the appropriate characterization of the Appeals Council's decision is that the Appeals Council merely "looked at" Plaintiff's supplemental evidence for purposes of denying Plaintiffs' request for review of the ALJ's decision, but did not "consider" it.  *Brewes*, 682 F.3d at 1162; *Amor*, 743 Fed. App'x at 146; *Garcia*, 2021 WL 223205, at *3 (concluding that where Appeals Council's decision stated the records at issue were not pertinent to the relevant time period, Appeals Council merely "looked at" the evidence).  As such, the Court may not review the supplemental records unless it finds Plaintiff carried his burden to demonstrate the evidence should have been considered by the Appeals Council.  *See Amor*, 743 Fed. App'x at 146; *Lowry*, 329 F.3d at 1024.

/ / /

### 2. Whether Plaintiff Met His Burden with Respect to the New Evidence

Plaintiff argues the Appeals Council "incorrectly determined that additional evidence submitted by Plaintiff was not material…." (Doc. 15 at 16.)  Thus, Plaintiff appears to only take issue with the Appeals Council's rejection of the records that it expressly determined did not show a reasonable probability they would change the outcome of the decision, and not the records it found to be duplicative of preexisting exhibits or outside the applicable disability period (*i.e.*, AR 13, 27–67, 345).  Further, Plaintiff only expressly refers to and discusses the supplemental records from treating physician Dr. Pelc dated October 2, 2019 through July 29, 2021, and treating therapists Angela Lancaster, Maria Dahlmann, and Karen Contreras dated September 18, 2019 through August 3, 2021 (i.e., "the month that the ALJ determination was issued") (AR 91–344).  (Doc. 15 at 17.)  To the extent Plaintiff does not challenge the rejection of the other supplemental records identified by the Appeals Council (AR 2), such argument is waived.  *Lewis*, 236 F.3d at 517 n.13; *Indep. Towers of Wash. v. Wash.*, 350 F.3d 925, 929 (9th Cir. 2003) (stating court "will not consider any claims that were not actually argued in appellant's opening brief" and will only "review … issues which are argued specifically and distinctly in a party's opening brief.").

As previously noted, Plaintiff's burden includes establishing the evidence is new, material, and there is a reasonable probability that the additional evidence would change the outcome of the decision, it relates to the period on or before the date of the hearing decision, and good cause exists for the late submission.  20 C.F.R. §§ 416.1470(a)–(b).  The Court considers each factor, in turn.

### (a) Whether Good Cause Exists for the Late-Submission

As an initial matter, the Court must consider whether Plaintiff meets the good cause requirement.  20 C.F.R. §§ 404.970(b).  It is doubtful Plaintiff has established this threshold requirement.  Section 404.970(b) enumerates the "good cause" reasons for a claimant's failure to timely inform the Commissioner about or submit the evidence:

(1) Our action misled you;

(2) You had a physical, mental, educational, or linguistic limitation(s) that prevented you

from informing us about or submitting the evidence earlier; or

(3) some other unusual, unexpected, or unavoidable circumstance beyond your control prevented you from informing us about or submitting the evidence earlier.  Examples include, but are not limited to:

(i) You were seriously ill, and your illness prevented you from contacting us in person, in writing, or through a friend, relative, or other person;

(ii) There was a death or serious illness in your immediate family;

(iii) Important records were destroyed or damaged by fire or other accidental cause;

(iv) you actively and diligently sought evidence from a source and the evidence was not received or was received less than 5 business days prior to the hearing; or

(v) You received a hearing level decision on the record and the Appeals Council reviewed your decision.

20 C.F.R. § 404.970(b).  Plaintiff's briefing cites to 20 C.F.R. §§ 404.970(a)(5) & (b), but only notes all of the requirements under subsection (a) and not the good cause requirement under subsection (b).  (See Doc. 15 at 16–17.)  Nowhere in Plaintiff's briefing does he argue that the good cause requirement was satisfied.  (*See generally*, Doc. 15 at 16–19.)

Nevertheless, Plaintiff notes the ALJ states in his opinion that the SSA had requested updated records from Dr. Pelc, and that the doctor's office responded that there is "no medical record to send" (*see* AR 80, 85 (citing AR 612)) , but then argues such "was obviously not the case," as the subsequently-submitted records include treatment notes dated from September 2019 to August 2021.  (Doc. 15 at 18.)  While the Court notes the burden to submit evidence of disability lies with the claimant, not the ALJ, it is possible Plaintiff's statement may be construed to fall under the good cause examples (3)(iii) or (3)(iv) under 20 C.F.R. § 404.970(b).   Further, the Court notes Defendant does not raise the issue of good cause in its oppositional briefing, but instead only discusses Plaintiff's "reasonable probability" argument on the merits, thus appearing to concede this point in opposition.  (*See generally*, Doc. 17 at 6–11.)  Accordingly, while the Court remains skeptical that Plaintiff has sufficiently established good cause exists to consider the identified, untimely-submitted supplemental records, out of an abundance of caution, the Court

1    addresses the remaining § 404.970(a) factors below.

2    **(b) Whether Plaintiff's Evidence Relates to the Period on or Before the**

3    **Date of the Hearing Decision**

4    This requirement is met.  As noted, Plaintiff's argument concerns only the supplemental

5    records from treating physician Dr. Pelc dated October 2, 2019 through July 29, 2021, and

6    treating therapists Angela Lancaster, Maria Dahlmann, and Karen Contreras dated September 18,

7    2019 through August 3, 2021, (AR 91–344; Doc. 15 at 17), thus falling within the relevant

8    disability period prior to the ALJ's August 4, 2021 decision.  Further, none of the proffered

9    records predate the alleged date of onset of disability (February 5, 2019).  Finally, Defendant does

10   not oppose a finding that the supplemental records are confined to the appropriate time period and

11   thereby waives such argument.  (*See* Doc. 17 at 7 & n.4.)  Accordingly, Plaintiff has met his

12   burden as to this requirement.

13   **(c) Whether Plaintiff's Evidence is "New"**

14   Evidence is new if it is not duplicative or cumulative.  *Meyer v. Astrue*, 662 F.3d 700,

15   704–05 (4th Cir. 2011).  In addition, evidence can be deemed new if it was not available when the

16   ALJ issued the decision.  *Threet v. Barnhart*, 353 F.3d 1185, 1191 (10th Cir. 2003).

17   As noted, Plaintiff's treating physician, Dr. Pelc, represented to the SSA via letter dated

18   October 5, 2020 that his office had no medical records relating to Plaintiff and refused to provide

19   records in response to the SSA's request.  (See AR 612.)  However, it is plain from the

20   supplemental records produced by Plaintiff that such records did, in fact, exist.  At the

21   administrative hearing, too, Plaintiff and his girlfriend/wife testified they believed additional

22   therapist records existed beyond the records from Drs. Pelc and Castillo that the ALJ identified.

23   However, they were unable to provide names of any of the therapists or confirm whether the

24   record before the ALJ at the time of the hearing was complete.  (*See* AR 362–63.)

25   Notwithstanding the inexplicable and plainly mistaken response from Dr. Pelc to the

26   SSA's initial request for records, it remains undisputed that the records were not available when

27   the ALJ issued his decision, but were only submitted to the Appeals Council thereafter.  Thus,

28   they are deemed new.  Nor do the records appear to be duplicative, though there is a colorable

argument that they are, at times, cumulative, as discussed in greater detail herein.  In any event, the records are deemed "new" for purposes of § 416.1470(a)(5).

### (d) Whether the Evidence is Material and There is a Reasonable Probability that the Evidence Would Change the Outcome of the Decision

To be material, "the new evidence must bear directly and substantially on the matter in dispute."  *Mayes v. Massanari*, 276 F.3d 453, 462 (9th Cir. 2001) (citation and quotation marks omitted).  The claimant must also "demonstrate that there is a reasonable possibility that the new evidence would have changed the outcome" of the disability determination.  *Id*.

As to the identified records, the ALJ found that Plaintiff has the severe impairments of major depressive disorder, borderline intellectual functioning, and obesity.  (AR 74.)  Plaintiff additionally claims he has, and the ALJ should have considered, his impairments of GAD and insomnia.  (Doc. 15 at 18–19.)  The supplemental records concern Plaintiff's complaints and treatment regarding these mental health impairments.  Dr. Pelc's treatment notes diagnose Plaintiff with these conditions.  Thus, the supplemental records appear to be material to Plaintiff's claims.  *Mayes*, 276 F.3d at 462.

To evaluate whether there is a reasonable probability that the new evidence would change the outcome of the ALJ's decision, the Court briefly summarizes Plaintiff's claims and new evidence, and the ALJ's denial based on the original evidence only.

### i) Plaintiff's Symptom Allegations and Testimony

On his disability application, Plaintiff alleges he is unable to work solely due to major depression.  (AR 478.)  At the hearing before the ALJ, Plaintiff's "girlfriend/wife," Tachua Vue, largely testified on Plaintiff's behalf that he suffered from depression, had memory issues and difficulties doing tasks that are asked of him, getting up to go to work, and handling things.  (*See* AR 367–68, 369.)  Plaintiff/Ms. Vue further testified that Plaintiff would sometimes feel paranoid and anxious, that he experience mental relapses where he "freaks out," cannot function, and starts crying.  (AR 371–72.)

/ / /

1         ii)      Summary of Relevant New Evidence (AR 91–344)

2         The earliest treatment note included with Plaintiff's "new" evidence before the Appeals

3 Council is a September 18, 2019 initial therapy evaluation note with therapist Angela Lancaster.

4 (AR 341–43.)  At that appointment, Plaintiff recounted his history of depression.  Plaintiff

5 reported he had a history of depression and anxiety since 2014.  He also reported that he and his

6 wife split up briefly in 2013, and were involved in a difficult custody/court battle.  At that time,

7 Plaintiff's symptoms worsened due to the stress (this is when he was first diagnosed and started

8 medications); he and his wife decided to get back together in 2014 for the sake of their son.

9 Plaintiff also reported he attempted suicide in 2016 after having issues with his wife and was

10 placed on a psychiatric hold, but has not had any suicidal thoughts since that incident.  (AR 167.)

11         Plaintiff reported that his symptoms were better after that, but that his symptoms were

12 triggered in February 2019 (coinciding with the alleged date of disability onset) when he lost his

13 job "for no reason" after reporting difficulty with a new security manager with whom Plaintiff did

14 not see eye-to-eye.  (See AR 166–67.)  The loss of Plaintiff's job also caused difficulty in his

15 relationship with his wife and son, though it also appears from Plaintiff's treatment notes that his

16 relationship with his putative wife has been unstable for several years.  Plaintiff reported he

17 attempted to get another job in March, but "went emotionally crazy," which resulted in him

18 leaving his job and traveling to Mexico, where he stayed with his mother for a few days before

19 returning home; he claims he has not been able to apply for work since this incident and applied

20 for SSDI.  (See AR 202–04.)  Thereafter Plaintiff retained a lawyer to pursue a legal case for

21 financial compensation for being falsely terminated.  He reported intense anger and the desire to

22 get revenge during sessions in which he discussed his former job.  (See AR 328–30.)  Plaintiff's

23 lawsuit ultimately settled, and Plaintiff received a settlement for lost wages.  (See AR 297–99.)

24         On mental examination at his September 2019 appointment, therapist Lancaster observed

25 Plaintiff was well-groomed, with a depressed mood and flat affect; normal speech, thought

26 process, and content; he reported difficulty with focus and memory at times, as well as disrupted

27 sleep and some limitations in his activities of daily living ("ADLs") due to his mental conditions;

28 Lancaster found Plaintiff had fair insight.  (AR 342.)  She diagnosed Plaintiff with major

depressive disorder, recurrent severe and GAD.  (AR 342, 343.)  She recommended Plaintiff get a therapist who could identify referrals for crisis stabilization or intensive outpatient programs as recommended; and to continue individual therapy.  (AR 343.)

Thereafter, Plaintiff was seen regularly by a therapist, up to twice a week.  He generally treated with therapist Lancaster until late-October; he saw therapist Maria Dahlmann from late-October 2020 until late-February 2021; and he generally saw therapist Karen Contreras from late-February 2021 through August 2021.  (*See generally*, AR 91–344.)  Plaintiff's mood varied at his appointments.  Sometimes, he reported improvement.  (*See, e.g.*, AR 328–30 (Oct. 22, 2019, getting out for walks helped); AR 323–27 (Nov. 6, 2019, reporting therapy improved depression); AR 309–11 (Dec. 3, 2019, reported mood: "I'm good."); AR 303–04 (Dec. 12, 2019, reported feeling slightly improved); AR 300–02 (Dec. 26, 2019, reportedly felt more like himself); AR 297–99 (Jan. 9, 2020, mood reported as more stable); AR 294–96 (Jan. 22, 2020, reported better self-care and general wellness); AR 286–88 (Feb. 4, 2020, reported feeling "normal" when taking medications); AR 280 – 82 (Feb. 26, 2020, reported feeling happier listening to podcasts); AR 240–42 (June 8, 2020, reported improved interactions with wife and medications working better); AR 171 (Feb. 19, 2021, reported relaxing visit with family in Mexico, until he returned home to his wife); AR 146 (Mar. 30, 2021, reported increased awareness about making positive choices to assist in stabilizing mood, such as exercise, projects, socializing safely, and spending time with son); AR 143–45 (Apr. 6, 2021, reported happy and at peace, controlled by internal rather than external circumstances and choice); AR 102 – 04 (July 19, 2021, mood had increased, was more positive, getting out more, socializing with family).)

Other times, he reported feeling depressed and anxious.  (*See* AR 338–40 (Sept. 25, 2019); AR 320–22 (Nov. 5, 2019); AR 283–85 (Feb. 12, 2020); AR 272–74 (Mar. 12, 2020); AR 261–63 (Apr. 9, 2020); AR 213–15 (Aug. 31, 2020); AR 205–07 (Oct. 15, 2020); AR 163–64 (Mar. 4, 2021); AR 128–30 (May 11, 2021); AR 105–07 (July 8, 2021).)  Every one of Plaintiff's treating providers opined that Plaintiff's depression/anxiety was caused by feeling isolated due to the COVID quarantine and his difficult relationship with his wife, which included conflicting sentiments about the necessity of vaccinating and social distancing between himself and his

"paranoid," "germaphobe" wife.  (*See, e.g.*, AR 96–97, 109, 137–38, 140, 150–51, 157, 167, 171, 175–76, 178, 180, 187, 193, 195, 254–57, 258–60, 261–63, 264–67, 283–85, 320–22; *see also* AR 221–23 (Aug. 13, 2020, assessed with "major depressive disorder, single episode, moderate" and "problems in relationship with spouse or partner"); AR 191 (Oct. 23, 2020, reported self-harm (cutting) arising from fear that wife would find out about someone at work Plaintiff had been getting close to and texting).)  For example, during his October 23, 2020 visit with therapist Dahlmann, Plaintiff expressed a lot of contempt for his wife and the pandemic, and Dahlmann opined that Plaintiff's long-term depression stemmed from his long-term dissatisfaction with his relationship and the loss of hope that things could be worked out between them.  (AR 191–92.)  It was strongly recommended that Plaintiff attend couple's therapy and/or treat weekly with a therapist to address his issues with his wife; the record does not indicate Plaintiff ever followed through with these recommendations.  (*See* AR 125.)  Further, while Plaintiff's mental examinations during these visits generally yielded findings of depressed mood and flat affect, Plaintiff also exhibited good insight, was oriented, cooperative, and demonstrated normal behavior, speech, thought process and content, and "no major impairments" in judgment.  (*See supra*.)

During a number of appointments, Plaintiff also reported difficulty sleeping (*see, e.g.*, AR 186, 195, 264–67, 323–27, 331–33, 338–40, 342), but during at least as many of his appointments, his therapist noted in the mental examination results that Plaintiff did not complain of sleep disturbances (*see, e.g.*, AR 91–92, 100, 107, 118, 121, 129, 132, 135, 138, 141, 144, 147, 154, 161, 164, 167–68; *see also* AR 309–11 (reported therapy has been "going good," energy levels are "fine," and sleep has been "not bad"); AR 209–11 (medications helpful with sleep and no side effects)).  The recommended treatment plan from all of Plaintiff's treating providers routinely was to continue therapy and medications.

Plaintiff also had follow up psychiatric visits with Dr. Pelc, approximately every month.  (AR 334–37 (Oct. 2, 2019); AR 323–27 (Nov. 6, 2019); AR 309–11 (Dec. 3, 2019); AR 286–88 (Feb. 4, 2020); AR 176–78 (Mar. 3, 2020); AR 264–67 (Mar. 31, 2020); AR 254–57 (Apr. 28, 2020); AR 243–46 (May 28, 2020); AR 236–39 (June 24, 2020); AR 233–35 (July 24, 2020); AR

216–18 (Aug. 21, 2020); AR 209–11 (Sept. 18, 2020); AR 198 (Oct. 23, 2020); AR 171 (Feb. 19, 2021); AR 157 (Mar. 18, 2021); AR 124 (May 14, 2021); AR 95 (July 29, 2021).)  These appointments generally lasted for seven to ten minutes, and were for the purpose of obtaining renewals for Plaintiff's medications.  (*See id*.)  During his visits with Dr. Pelc, Plaintiff would briefly discuss his reaction to medications and report his symptoms.  Dr. Pelc often recommended that Plaintiff have a sleep study completed (as Dr. Pelc opined Plaintiff's sleep patterns were affecting his depression), get a primary care physician, attend weekly therapy to deal with his issues with his wife (who Dr. Pelc identified to be "a significant source of [Plaintiff's] depression"), increase exercise "as much as possible," and do mindfulness activities; Dr. Pelc noted Plaintiff sometimes reported engaging in the mindfulness activities or going on walks (with reported improved mood), but Plaintiff never followed up with Dr. Pelc's other recommendations, and he declined referrals to a psychotherapy program and nutrition program.  (*See id*.)

During Plaintiff's last treatment visit of record, an August 3, 2021 with therapist Karen Contreras, Plaintiff reported his wife went back to work and his son would be attending in-person school that month.  (AR 91–93.)  Plaintiff reported he would be driving the son and other family members to and from school, babysitting the children until his parents got home from work, and assisting in caring for twins that would soon be born.  (AR 91.)  Plaintiff reported he was feeling improved mood and decreased anxiety and had no sleep deprivation.  (AR 91–92.)  A mental status examination revealed Plaintiff was alert and cooperative; low mood and anxious; with normal affect, behavior, speech, thought process/content, and insight/judgment.  (AR 92.)  Therapist Contreras assessed improvement as to diagnoses of "major depressive disorder, recurrent, moderate," and "anxiety disorder, unspecified," and recommended Plaintiff continue his individual therapy.  (AR 92–93.)

### iii)   Analysis

As to the identified records, Plaintiff argues there is a "reasonable probability" that the evidence would change the outcome of the ALJ's decision.  (Doc. 15 at 17.)  The main thrust of Plaintiff's argument is that the supplemental records, which the ALJ did not have the benefit of considering when he issued his nondisability decision, show significant worsening of Plaintiff's

condition, and show additional symptoms—such as Plaintiff's insomnia—which do not appear in the original record.  (*See id*. at 18–19.)  The Court, however, finds Plaintiff's arguments unpersuasive.

First, the Court notes that the same symptoms reported by Plaintiff in the supplemental records were testified to by Plaintiff at the administrative hearing, and are reported in the medical records that were originally considered by the ALJ.  In fact, the ALJ acknowledged Plaintiff experienced some depressive-related symptoms at times, and might not prefer to interact with others on a regular basis, as reported in the medical records and Plaintiff's reports of depression, memory issues, paranoia, anxiety, and having difficultly handling things (*see* AR 77); this formed the basis for the ALJ's determination that Plaintiff had moderate functional limitations requiring restrictions to simple and routine tasks, only frequent engagement in production pace work and changes in the workplace, and only occasional interaction with supervisors, coworkers, and the public.  (*See* AR 75, 76.)

Importantly, the ALJ also discounted Plaintiff's testimony and symptom allegations for several reasons.   For example, the ALJ noted Plaintiff's ADLs did not support Plaintiff's allegations of total incapacity.  *See Smartt v. Kijakazi*, 53 F.4th 489, 499 (9th Cir. 2022) ("An ALJ may also consider whether the claimant engages in activities inconsistent with the alleged symptoms."); *Burch*, 400 F.3d at 680 (finding the ALJ properly discounted the claimant's allegations where the claimant's activities suggest higher functionality, including caring for personal needs, cooking, cleaning, shopping, and interacting with family).  In particular, the ALJ noted Plaintiff was able to perform personal care tasks, simple meal preparation, driving—which the ALJ noted "demands the individual focus on multiple tasks at the same time, process information from more than one source, attend to multiple elements of information, shift attention back and forth as needed, and continuously monitor information from the road scene while being able to scan the environment for potential hazards" (AR 77)—use ride share/Uber, maintain relationships with his wife and son, initiate and sustain conversation, attend doctor/therapy appointments without conflict, advocate for himself, complete tasks in a timely manner, sometimes attend church and his son's soccer games, and travel on multiple occasions to Mexico

1   to visit family.  (AR 75.)  Much of these ADLs—such as Plaintiff's trips to Mexico, his

2   interactions with his son, family and friends, driving, taking walks, and tending to his personal

3   needs—are described in the supplemental records as well as the original records that were

4   considered by the ALJ.  This demonstrates the supplemental records are consistent with the

5   evidence already part of the longitudinal record.

6          The ALJ also found Plaintiff's allegations were not fully supported by the medical

7   evidence.  (AR 77–78); *see Hairston v. Saul*, 827 Fed. App'x 772, 773 (9th Cir. 2020) (quoting

8   *Carmickle v. Comm'r, Soc. Sec. Admin*., 533 F.3d 1155, 1160 (9th Cir. 2008), with approval)

9   ("[c]ontradiction with the medical record is a sufficient basis for rejecting the claimant's

10  subjective testimony.").  The ALJ noted the clinical findings are relatively minimal, when

11  compared to Plaintiff's severe subjective complaints.  In particular, the ALJ noted the record

12  reflects Plaintiff's mental conditions are generally stable, manageable, and favorably responsive

13  to medication/treatment.  (AR 78); *see Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007)

14  ("[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding

15  severity of an impairment.") (citation omitted); *Warre v. Comm'r of Soc. Sec. Admin*., 439 F.3d

16  1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are

17  not disabling for the purpose of determining eligibility for SSI benefits.").  This is also consistent

18  with the findings in the supplemental record, which show Plaintiff was only prescribed

19  conservative treatments (therapy and medication), and Plaintiff reported at times that the

20  medication alleviated his symptoms.  The ALJ also noted that, even when Plaintiff complained of

21  depression, his mental examinations were, nevertheless, without significant abnormalities,

22  demonstrated normal speech, linear thought processes, and intact memory.  As demonstrated in

23  the Court's prior discussion of the supplemental records, these mental examinations are consistent

24  with the examinations reflected in the supplemental records as well.

25         The ALJ further noted "there is no evidence of urgent care or in-patient psychiatric

26  treatment for mental crisis and there does not appear to be any contact with law enforcement over

27  mental health issues."  (AR 78.)  Plaintiff appears to take issue with this finding by the ALJ,

28  arguing that the supplemental evidence refutes this finding because it shows intensive outpatient

1   hospitalization program ("IOP") was recommended "on a number of occasions."  (Doc. 15 at 18.)

2   The Court, however, disagrees.  On October 2, 2019, Dr. Pelc appears, as Plaintiff notes, to have

3   encouraged Plaintiff to enroll in the IOP program due to his continued depression.  (*See* AR 336.)

4   However, the record shows Plaintiff attended once, but declined to do so again, complaining that

5   the program was located in a "scary" neighborhood and there were not any other nearby

6   locations.  (AR 337.)  The supplemental records show Dr. Pelc made several other treatment

7   recommendations as well—such as getting lab work, seeing a sleep specialist and participating in

8   a sleep study to address Plaintiff's reported insomnia (which Dr. Pelc opined was impacting

9   Plaintiff's depression); attending a local anonymous marital support group on his own; getting a

10  primary care physician; and increasing exercise as much as possible—but Plaintiff never followed

11  these recommendations.  Further, Plaintiff also rejected Dr. Pelc's offers to refer him to

12  psychotherapy and nutrition programs, indicating his belief that weekly and bi-weekly therapy

13  and medications were sufficient at that time.  (*See, e.g.*, AR 96–97, 198); *see also Stenberg v.*

14  *Comm'r Soc. Sec. Admin.*, 303 Fed. App'x 550, 552 (9th Cir. 2008) (finding noncompliance with

15  recommended treatments, such as attending only half of scheduled therapies and refusing

16  psychological counseling and continued physical therapy, constituted substantial evidence in

17  support of finding the claimant was not entirely credible).  Thus, as the supplemental records

18  reveal Plaintiff rejected opportunities for further referrals and declined to attend IOP and follow

19  other recommended treatment options, the Court finds the supplemental records are not

20  inconsistent with the longitudinal record that was previously before the ALJ, and the ALJ's

21  finding that Plaintiff did not engage in "urgent care or in-patient psychiatric treatment for mental

22  crisis" or require "law enforcement [intervention] over mental health issues."

23          Finally, the Court finds Plaintiff's argument that the supplemental records demonstrate a

24  worsening condition is belied by the records themselves.  As previously noted, a number of

25  treatment notes indicated Plaintiff reported improvement at various times, as he continued to

26  attend therapy and take medications.  The most recent treatment note contained in the

27  supplemental records (dated August 3, 2021), indicates Plaintiff reported an improved mood,

28  decreased anxiety, and no sleep deprivation.  (AR 91–92.)  Plaintiff also reported his wife went

back to work and his son would be attending in-person school.  These facts are significant, as all of Plaintiff's treating physicians in the supplemental records opined that Plaintiff's depression and anxiety—which had appeared to be improving prior to COVID, but became recurrent with the pandemic—persisted due to the effects of feeling isolated during the pandemic quarantine and due to the strain on relationships caused by differing beliefs regarding the necessity of certain safety protocols.  *See Chesler v. Colvin*, 649 Fed. App'x 631, 632 (9th Cir. 2016) (according less import to "situational" mental symptoms, which were "unlikely to persist once [the claimant's] circumstances improved").  Furthermore, Plaintiff's therapist recommended Plaintiff continue therapy, but did not opine that further, more intensive treatment was required.  This, too, cuts against a finding that the records demonstrate a "worsening" of Plaintiff's condition.

        In sum, the Court has reviewed the supplemental records and determined they generally contain the same symptom allegations as those considered under the original record by the ALJ, the same reports of symptoms and ADLs by Plaintiff, and generally the same mental examination findings.  Thus, because the supplemental records are consistent with the longitudinal record that was originally before the ALJ, the ALJ's evaluation of the medical and non-medical evidence, (*Andrews*, 53 F.3d at 1039), and his decision to discount Plaintiff's symptom testimony and assess the RFC determination with certain mental limitations—findings which Plaintiff does not directly challenge—would not be altered by inclusion of the supplemental records.  Further, because of the striking similarities and consistency between the medical records, to the extent Plaintiff argues the supplemental records demonstrate a worsening in condition, the Court finds Plaintiff's argument amounts to little more than an attempt to reweigh the evidence, which the Court cannot do.  *See Gardner v. Barnhart*, 73 Fed. App'x 193, 195 (9th Cir. 2003); *Smartt*, 53 F.4th at 499; *Tommasetti*, 533 F.3d at 1038.

        Accordingly, the Court finds Plaintiff has not met his burden to "demonstrate that there is a reasonable possibility that the new evidence would have changed the outcome" of the disability determination.  *Mayes*, 276 F.3d at 462.

        **B. The ALJ's Evaluation of Plaintiff's Generalized Anxiety Disorder ("GAD")**

        Next, Plaintiff argues the ALJ erred at step two of the disability inquiry by "failing to

consider the established impairment of GAD to be severe, resulting in an incomplete mental residual functional capacity assessment." (Doc. 15 at 19–23.)  The Court finds Plaintiff's argument unavailing, as follows.

### 1. Legal Standard

At step two of the disability inquiry, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments.  *Smolen v. Chater*, 80 F.3d 1273, 1289–90 (9th Cir. 1996) (citing *Bowen*, 482 U.S. at 140–41).  In reaching this determination, "the ALJ must consider the combined effect of all of the claimant's impairments on [his] ability to function, without regard to whether each alone was sufficiently severe." *Id.* at 1290 (citing 42 U.S.C. § 423(d)(2)(B)).  Further, the Regulations require "a careful evaluation of the medical findings which describe the impairment(s) and an informed judgment about its (their) limiting effects on the individual's physical and mental ability(ies) to perform basic work activities…"  SSR 85-28, at *4, available at 1985 WL 56856 (Jan. 1, 1985).  At step two, "medical evidence alone is evaluated in order to assess the effects of the impairment(s) on ability to do basic work activities."  SSR 85-28, at *4.

Notably, Ninth Circuit precedent treats step two of the disability inquiry as "a de minimis screening device to dispose of groundless claims."  *Smolen*, 80 F.3d at 1290.  Thus, "[i]f an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation should not end with the not severe evaluation step." *See Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005) (citing SSR 85-28).  Nonetheless, "[t]he plaintiff has the burden of establishing the severity of the impairment." *See, e.g., Burch*, 400 F.3d at 679 ("The claimant carries the initial burden of proving a disability in steps one through four of the analysis.") (citation omitted).

### 2. Analysis

Plaintiff argues the ALJ was required to consider the "established impairment of generalized anxiety disorder," but failed to characterize it as either severe or non-severe; Plaintiff further argues his GAD was, in fact, severe based on the medical and non-medical evidence, but that the ALJ failed to discuss the GAD diagnosis or related symptoms.  (Doc. 15 at 20.)

As an initial matter, the Court notes it is undisputed that the ALJ found Plaintiff had the "severe" impairments of major depressive disorder, borderline intellectual functioning, and obesity (AR 74), but he did not include GAD as an impairment singularly or in the group of impairments he considered to be "severe in combination" at step two.  However, the Court is unpersuaded that Plaintiff's GAD constitutes an "established impairment."  Importantly, the Court is not entirely persuaded that Plaintiff sufficiently established his GAD constitutes a "medically determinable impairment," a burden which is his.  *See Ford*, 950 F.3d at 1148 (claimant has burden of proof at steps one through four); *Burch*, 400 F.3d at 679 (same).

A "medically determinable impairment" under the Regulations must be established through medically acceptable clinical diagnostic techniques.  *Savannah v. Astrue*, 252 Fed. App'x. 783, 785 (9th Cir. 2007) (citing 20 C.F.R. § 416.908; 20 C.F.R. § 416.905(a); 42 U.S.C. § 423(d)(3)).  This requires the claimant to produce "medical evidence consisting of signs, symptoms, and laboratory findings, not only a statement of symptoms."  *Id*. (citing 20 C.F.R. § 416.908) (internal quotations and edits omitted); *compare id*. (holding diagnosis by a medical expert constitutes objective medical evidence of an impairment) *with Ukolov v. Barnhart*, 420 F.3d 1002, 1006 (9th Cir. 2005) (claimant failed to meet his burden of establishing disability where none of the medical opinions he presented included a finding, diagnosis, or objective test results of impairment).

Here, it is unclear from the medical evidence that Plaintiff had an established impairment of GAD.  Notably, the medical records that were before the ALJ indicate Plaintiff was diagnosed with major depressive disorder only.  (*See, e.g*., AR 558–60.)  For example, Dr. Castillo's July 16, 2018 treatment note indicates Plaintiff was "experiencing anxiety," and on mental status examination, his mood was described as anxious; however, Dr. Castillo diagnosed Plaintiff with only major depressive disorder.  (AR 561.)  It also appears notable that Plaintiff's initial disability application only alleges disability based on "major depression" and does not mention GAD.  (AR 478, 481.)  Rather, Plaintiff's anxiety often appears in the medical record as one of many symptoms discussed in connection with Plaintiff's general mood and diagnosis of depression, alongside other symptoms such as panic, paranoia, overwhelm, and stress.  (*See* AR 558, 560–

64).)  Thus, it appears that Plaintiff's anxiety may reasonably have been attributed as a symptom of other conditions addressed and discussed by the ALJ with respect to Plaintiff's major depressive disorder.

Furthermore, even if the ALJ erred at step two by not including Plaintiff's GAD in the list of severe/combination of severe impairments, Plaintiff has not met his burden of establishing that such error was not harmless.  As previously noted, even if the ALJ has erred, the Court may not reverse the ALJ's decision where the error is harmless.  *Stout*, 454 F.3d at 1055–56.  An error is harmless if it is "inconsequential to the ultimate nondisability determination."  *Molina v. Astrue*, 674 F.3d 1104, 1117 (9th Cir. 2012), superseded by regulation on other grounds (quoting *Lewis*, 236 F.3d at 503) (holding "an error is harmless so long as there remains substantial evidence supporting the ALJ's decision and the error 'does not negate the validity of the ALJ's ultimate conclusion.'").  Moreover, it is the Plaintiff's burden to establish an error is not harmless.  *See Shinseki*, 556 U.S. at 409.  Within the context of a step two challenge, the aforementioned authorities indicate the purpose of the step two determination is to serve as a de minimis screening device.  Hence, the Regulations provide that, where the ALJ is unable to clearly determine whether an impairment is sufficiently severe, he is directed to err on the side of inclusivity and proceed to subsequent steps of the sequential disability inquiry, which require a more in-depth analysis of the record.

Here, the ALJ did proceed with the disability inquiry; moreover, he plainly considered Plaintiff's anxiety in his evaluation of the medical and nonmedical evidence to reach the RFC determination.  For example, the ALJ acknowledged Plaintiff and Ms. Vue's testimony that Plaintiff at times felt anxious, among other things.  (AR 77.)  Similarly, the ALJ addressed medical notes indicating Plaintiff reported medication helped with his anxiety, and that Plaintiff experienced symptoms such as anxiety.  (*See* AR 79 (citing AR 558, 560–64)); *see also Lewis v. Astrue* (Lewis II), 498 F.3d 909, 911 (9th Cir. 2007) ("Even assuming that the ALJ erred in neglecting to list the bursitis at Step 2, any error was harmless" because the ALJ discussed bursitis later in the disability analysis); *Schneider v. Comm'r*, 433 Fed. Appx. 507, 509 (9th Cir. 2011) (ALJ's failure to address claimant's migraines was harmless because medical record did

1   not support finding that migraines would affect claimant's functioning at work).

2       Notably, the medical record does not expressly include medical opinions as to any

3   limitations required to accommodate Plaintiff specifically for anxiety.  Nor does Plaintiff identify

4   any medical opinion setting forth concrete limitations based on anxiety that the ALJ failed to

5   consider.  Instead, Plaintiff relies nearly exclusively on his own symptom testimony and the

6   testimony of Ms. Vue to support his arguments that his anxiety symptoms were so severe, the

7   ALJ should have considered Plaintiff's anxiety to be a severe medical impairment.  This is a

8   problematic argument for Plaintiff, however, as the ALJ presented specific, clear and convincing

9   reasons (as previously discussed), *Lambert v. Saul*, 980 F.3d 1266, 1277 (9th Cir. 2020), for

10  discounting Plaintiff's symptom allegations as well as Ms. Vue's testimony—and Plaintiff has

11  not challenged that assessment.  Plaintiff's reliance on symptom allegations is also problematic

12  for his step two argument because the Regulations require that at step two, "medical evidence

13  alone is evaluated in order to assess the effects of the impairment(s) on ability to do basic work

14  activities."  SSR 85-28, at *4.

15      In any event, it is plain from the decision that the ALJ considered Plaintiff's alleged

16  symptoms, including anxiety, in reaching the RFC determination.  The record indicates,

17  generally, that Plaintiff tended to feel overwhelmed at work and around people, had difficulty

18  "handling things," and would "freak out" due to his conditions.  The ALJ considered these

19  symptoms and accounted for them by reaching a determination that Plaintiff was moderately

20  limited in the paragraph B functional categories.  Furthermore, the ALJ considered these

21  symptoms in the RFC by limiting Plaintiff to simple and routine tasks, as well as only occasional

22  interaction with other people.  (AR 76); *see, e.g., Stubbs-Danielson v. Astrue*, 539 F.3d 1169 (9th

23  Cir. 2008) (limitation to "simple, routine, repetitive" tasks accommodates "several moderate

24  limitations in other mental areas.").  Plaintiff has not challenged the ALJ's evaluation of the

25  medical opinions or otherwise demonstrated the medical evidence compels a different RFC

26  determination.

27      For the foregoing reasons, the Court concludes Plaintiff's step two argument is unavailing.

28  / / /

### C. Duty to Further Develop the Record

Finally, Plaintiff argues the ALJ "failed to fully and fairly develop the record, by failing to secure updated medical evidence." (Doc. 15 at 23–25.)

#### 1. Legal Standard

Generally, "[t]he claimant has the burden of proving that [he] is disabled." *Smolen*, 80 F.3d at 1288. However, "[t]he ALJ always has a 'special duty to fully and fairly develop the record and to assure that the claimant's interests are considered … even when the claimant is represented by counsel.'" *Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003) (quoting *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983)). Further, "[w]hen a claimant is not represented by counsel, this responsibility is heightened." *Id*. This is because "Social Security proceedings are inquisitorial rather than adversarial." *Schiaffino v. Saul*, 799 Fed. App'x 473, 476 (9th Cir. 2020) (quoting *Sims v. Apfel*, 530 U.S. 103, 111–12 (2000)). In particular, the ALJ's duty to develop the record fully is heightened where the claimant may be mentally ill and thus unable to protect his own interests. *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (citing *Higbee v. Sullivan*, 975 F.2d 558, 562 (9th Cir. 1992)).

"The ALJ is not a mere umpire at such a proceeding, but has an independent duty to fully develop the record … it is incumbent upon the ALJ to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts. [He] must be especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Celaya*, 332 F.3d at 1183 (quoting *Higbee*, 975 F.2d at 561).

Nevertheless, "[a]n ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes*, 276 F.3d at 459–60; *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) (citing 20 C.F.R. §§ 404.1512(e), 416.912(e)); *see Brown v. Berryhill*, 697 Fed. App'x 548, 549 (9th Cir. 2017) ("Because the record evidence was not ambiguous and the record was sufficient to allow for proper evaluation of the evidence, the ALJ was not required to re-contact Brown's doctors or further develop the record.").

/ / /

**2. Analysis**

Here, Plaintiff appears to argue the RFC determination is not based on evidence from a treating or examining medical professional or any medical opinion; however, he alternatively argues the ALJ's reliance on medical opinions issued in February 2020 and no evidence dated later than September 4, 2019 renders the RFC invalid.  (Doc. 15 at 23–24.)  These arguments are unavailing for a number of reasons.

Importantly, Plaintiff does not make any non-conclusory arguments that the record was ambiguous or inadequate; thus, the duty to further develop the record was not triggered.  *Mayes*, 276 F.3d at 459–60; *Bayliss*, 427 F.3d at 1217; *Brown*, 697 Fed. App'x at 549.

Further, as to the first argument, a plain reading of the ALJ's decision, which is inclusive of citations to the medical record and specific discussions of the medical opinions and treating providers' notes, demonstrates the ALJ based the RFC determination on medical evidence.  (*See generally*, AR 75, 79–83, 85.)  Thus, Plaintiff's argument that there were no medical experts providing opinions for the ALJ to consider is erroneous.

Plaintiff's alternative argument also is flawed.  To the extent Plaintiff's argument is that the ALJ is not permitted to reach an RFC determination without a medical expert opinion setting forth specific limitations for him, such a position is not supported in law.  The RFC determination is not a medical opinion; it is a legal determination expressly reserved for the Commissioner.  *Vertigan*, 260 F.3d at 1049.  It therefore is squarely within the ALJ's province to synthesize the medical evidence, resolve conflicts and ambiguities in the medical testimony, and determine credibility.  *See Andrews*, 53 F.3d at 1039; *Batson*, 359 F.3d at 1195; *see also Lingenfelter*, 504 F.3d at 1042 ("When evaluating the medical opinions of treating and examining physicians, the ALJ has discretion to weigh the value of each of the various reports, to resolve conflicts in the reports, and to determine which reports to credit and which to reject.").  Indeed, not only does the RFC determination fall exclusively under the ALJ's province; the Regulations and controlling legal authorities require an ALJ to evaluate the objective medical evidence in the record.  *See* 20 C.F.R. § 404.1520b ("After we review all of the evidence relevant to your claim, we make findings about what the evidence shows.")

Further, courts have held the RFC does not need to precisely reflect any particular medical provider's assessment, *Althoff-Gromer v. Comm'r of Soc. Sec.,* No. 2:18-cv-00082-KJN, 2019 WL 1316710, at *13 (E.D. Cal. Mar. 22, 2019), nor does it need to include limitations verbatim, *Langford v. Astrue*, No. CIV S–07–0366 EFB, 2008 WL 2073951, at *3 (E.D. Cal. May 14, 2008); moreover, they indicate a medical expert opinion is not required to synthesize the medical evidence in reaching the RFC determination where the record is unambiguous. *See Bufkin v. Saul*, 836 Fed. App'x 578, 579 (9th Cir. 2021) ("ALJs need not seek the opinion of a medical expert every time they review new medical evidence and make a RFC determination."). As to Plaintiff's argument that the ALJ failed to obtain a consultative examination (Doc. 15 at 24), the regulations provide that the agency may obtain a consultative examination to resolve evidentiary ambiguity or insufficiency, not that an ALJ must do so in every case. *See Corwin v. Kijakazi*, No. 1:20-cv-00394-GSA, 2021 WL 5771658, at *6 (E.D. Cal. Dec. 6, 2021); *see also* 20 C.F.R. § 404.1517. Thus, to the extent Plaintiff argues the ALJ was further required to develop the record because it lacked an expert medical opinion, the Court finds Plaintiff's argument is unavailing.

To the extent Plaintiff takes issue with the time gap between the medical records the ALJ reviewed and issuance of his decision, again, Plaintiff's argument is unsupported in law. The Court notes there is always a gap in time between a non-examining State agency physician's review at the initial and reconsideration levels and the ALJ's subsequent hearing decision, and "claimants routinely continue pursuing care in the interim thereby generating new medical records. If the mere passage of time and presence of additional medical evidence in the record established ambiguity," then a consultative examination or updated medical opinion would be required in every single Social Security case. *See Corwin*, 2021 WL 5771658, at *6. Further, the Ninth Circuit directly rejected a similar argument asserted by the claimant, regarding later-obtained evidence that was not reviewed by the state agency physicians. In upholding the ALJ's reliance on these medical opinions, which did not discuss the subsequent medical records, the appellate court explained, "there is always some time lapse between a consultant's report and the ALJ hearing and decision, and the Social Security regulations impose no time limit on such a gap in time. At the time they issued their opinions, the non-examining experts had considered all the

1  evidence before them, satisfying the requirements set forth in 20 C.F.R. § 404.1527(c)(3)." *Owen*

2  *v. Saul*, 808 Fed. App'x 421, 423 (9th Cir. 2020).  Thus, contrary to Plaintiff's assertions, "ALJs

3  need not seek the opinion of a medical expert every time they review new medical evidence and

4  make [an] RFC determination."  *Bufkin*, 836 Fed. App'x at 579.

5          To the extent Plaintiff argues the ALJ erred in his duty to develop the record because he

6  was unable to obtain the supplemental records Plaintiff later submitted to the Appeals Council,

7  Plaintiff's argument is unavailing.  As previously mentioned, it is unclear why Dr. Pelc declined

8  to provide the SSA with the records it requested, particularly where the request on its face

9  appeared sufficient to identify the claimant.  Of course, as Plaintiff notes, he was able to much

10  more easily request and obtain his own medical records from his treating physician (*see* Doc. 15

11  at 25); that is why it is the claimant's burden, not the ALJ's, to establish disability by presenting

12  all supporting evidence.  *Smolen*, 80 F.3d at 1288; *Parra*, 481 F.3d at 746; *Ford*, 950 F.3d at

13  1148.  Plaintiff's argument impermissibly attempts to shift the burden of proof to the ALJ.

14          Furthermore, the Court has determined that the Appeals Council did not err in declining to

15  incorporate and evaluate Plaintiff's "new" evidence, as Plaintiff did not meet his burden to

16  "demonstrate that there is a reasonable possibility that the new evidence would have changed the

17  outcome" of the disability determination.  *Mayes*, 276 F.3d at 462.  Plaintiff's argument that the

18  ALJ failed in his duty to further develop the record based on the failure to obtain these

19  supplemental records merely rehashes Plaintiff's prior argument and therefore fails.  *See Stubbs-*

20  *Danielson*, 539 F.3d at 1175–76 (rejecting a step five argument that "simply restates" arguments

21  about medical evidence and testimony); *Hairston*, 827 Fed. App'x at 773 (rejecting claimant's

22  arguments that RFC and step-five findings were unsupported by substantial evidence as

23  "derivative of her preceding arguments addressed and rejected above.")

24          Finally, a showing of unfairness or prejudice resulting from any failure to develop the

25  record is required for remand (*Graham v. Apfel*, 129 F.3d 1420, 1422-23 (11th Cir. 1997)), and

26  Plaintiff has not made this requisite showing.  On this record, the Court cannot conclude a duty to

27  further develop the record was triggered, or that the ALJ failed to perform such a duty.

28          The Court acknowledges Plaintiff appeared at the disability hearing without

representation, and the Ninth Circuit imputes a "heightened responsibility" to the ALJ under such circumstances.  *See Celaya*, 332 F.3d at 1183.  Nonetheless, "there is no constitutional right to representation at a Social Security hearing."  *Miller*, 33 Fed. App'x. at 914.  Rather, the right to counsel at a Social Security hearing is a statutory right, which may be waived.  *Graham*, 129 F.3d at 1422.  Thus, to the extent Plaintiff argues the record was undeveloped solely because he appeared without an attorney, his argument is unavailing.  Furthermore, even under this heightened standard, the ALJ's handling of the record was appropriate.  The hearing transcript reflects that the ALJ spent a significant time at the onset of the hearing confirming Plaintiff was aware of his right to an attorney, explaining to Plaintiff the potential advantages of being represented by counsel, notifying Plaintiff of the resources that would assist Plaintiff in obtaining representation—even potentially on a contingency fee basis—and offering Plaintiff the option to resume the hearing after obtaining counsel.  (*See* AR 353, 356–59.)  After this lengthy discussion, Plaintiff voluntarily waived his statutory right to representation at the hearing and elected to proceed with the hearing at that time.  (*See* AR 358–59.)

## V.    CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence and proper analysis.  Accordingly, IT IS HEREBY ORDERED:

1.  Plaintiff's motion for summary judgment appealing the decision of the Commissioner of Social Security (Doc. 15) is DENIED;

2.  Defendant's cross-motion for summary judgment (Doc. 17) is GRANTED; and

3.  The Clerk of the Court is DIRECTED to enter judgment in favor of Defendant and against Plaintiff Arthur Bernett Powers, and to close this case.

IT IS SO ORDERED.

Dated:   **October 30, 2023**

_____
UNITED STATES MAGISTRATE JUDGE